Filed 6/2/26  In re C.G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.G. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTOPHER G., <br><br> Defendant and Appellant. | F091007 <br><br> (Super. Ct. Nos. 21CEJ300019-3; 21CEJ300019-4) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas T. Sloan, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Christopher G. (father) is the father of C.G. and E.G. (collectively, the children), who are the subjects of this dependency case. Father challenges the juvenile court's order issued at a Welfare and Institutions Code section 366.26[1] hearing that resulted in his parental rights being terminated. Father contends the juvenile court erred when it declined to apply the beneficial parent-child relationship exception. Father also argues the juvenile court erred in denying his section 388 petition and excluding testimony in support of his request.

## FACTUAL AND PROCEDURAL BACKGROUND

### Initial Removal

In January 2021, the Fresno County Department of Social Services (the department) filed an original petition alleging C.G. and his siblings, J.L. and C.C. (siblings), were described by section 300, subdivision (b)(1). The allegations involved eight-month-old C.G. testing positive for methamphetamine without a reasonable explanation. The petition alleged father and the children's mother, Nicole O. (mother), had substance abuse problems that affected their ability to provide regular care for C.G. and the siblings. C.G. was detained from mother's custody on January 26, 2021.

The allegations were found true at the jurisdiction hearing held on March 10, 2021. The juvenile court ordered C.G. removed from the custody of mother and father, and family reunification services were provided for both parents. Father was ordered to participate in parenting classes, substance abuse evaluation and recommended treatment, mental health evaluation and recommended treatment, domestic violence evaluation and recommended treatment, and random drug testing. Supervised visits were to occur between father and C.G. twice per week upon father's release from incarceration. A six-month review hearing was set for October 13, 2021.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

*Family Reunification Period*

In August 2021, E.G. was detained shortly after his birth due to mother's substance abuse during the pregnancy. The department filed a petition alleging mother tested positive for amphetamines while E.G. was in utero. Father was in custody at the time of the child's removal. The juvenile court sustained the allegations pursuant to section 300, subdivision (b)(1), and family reunification services were ordered for mother at the jurisdiction and disposition hearing held on October 27, 2021. Mother identified father as the biological father of E.G., but he had not signed the declaration of parentage. Father was not ordered to participate in family reunification services for E.G. due to his status as an alleged father.

At a continued six-month review hearing on November 17, 2021, family reunification services were ordered to continue for mother and father as to C.G. In April 2022, the juvenile court continued family reunification services for mother as to E.G., and a 12-month review hearing was set for October 5, 2022. A combined 12-month and 18-month review hearing was scheduled for July 13, 2022, as to C.G. and the siblings. After several continuances, a contested review hearing was held on May 17, 2023, for the children and siblings.

The final report prepared for the combined 12-month review for E.G. and 24-month review for C.G. and siblings, dated February 13, 2023, recommended family reunification services be terminated for mother and father and a section 366.26 hearing be set. The children were placed together with their sibling C.C., and the care providers were willing to provide a permanent plan of adoption. A paternity test determined father was the biological father of E.G.

Father did not begin participating in services until October 2022. He graduated from his parenting class and started outpatient substance abuse treatment in January 2023. Father's random drug test results had been negative since October 2022. The social worker's report noted father was consistently attending his mental health services

and domestic violence program weekly. However, he never progressed past supervised visits due to his late participation in services. The department's assessment concluded that father failed to demonstrate his ability to complete the objectives of his treatment program because he did not maintain contact with the department, service providers, and children throughout the case.

The juvenile court adopted the department's recommendation at the contested review hearing, and terminated reunification services for mother and father. A section 366.26 hearing was set for August 30, 2023, for the children and siblings. Supervised visitation between the parents and children was reduced to twice per month.

*January 2024 Selection and Implementation Hearing*

The section 366.26 report, dated August 28, 2023, recommended that the juvenile court order continued foster care with a goal of placement with a fit and willing relative for J.L. and terminate the parental rights of mother and father and a plan of adoption be ordered for the children and C.C. The children remained placed together in their same placement, and their longtime care providers were willing to provide a plan of adoption.

The adoption social worker indicated that C.G. appeared "somewhat familiar" with father because he greeted father before a supervised visit. However, E.G. cried on and off during one of the visits, and he did not appear to be as familiar with father. Father was comfortable and affectionate with the children. E.G. was observed crying and calling out a care provider's name while father changed his diaper. The department's assessment determined that severing the relationship between the parents and children would not be detrimental due to the absence of a significant parent-child relationship.

On October 2, 2023, mother filed a section 388 petition. The children's court-appointed special advocate (CASA) recommended the department explore options other than adoption. The CASA observed visits between father and the children, and she believed the children demonstrated a bond with father.

On January 19, 2024, the juvenile court held a contested hearing on mother's section 388 petition and the section 366.26 hearing. The section 388 petition was denied. The juvenile court found termination of parental rights would be detrimental because there would be substantial interference with a sibling relationship and the children would benefit from continuing their relationship with the parents. A plan of legal guardianship was ordered for the children and C.C. Visits between father and the children were ordered to occur at a minimum of twice per month. The juvenile court ordered continued dependency jurisdiction, and a postpermanent plan review hearing was set for July 10, 2024.

*Postpermanency Proceedings*

The status review report, dated June 28, 2024, recommended legal guardianship with dependency remaining as the most appropriate permanent plan for the children and C.C. The children remained stable in their guardianship placement with C.C. During supervised visits, father was observed to interact with the children, but he had difficulty redirecting them from one task to another. Father's visits were discontinued due to his incarceration in May 2024. The department was unable to contact father to reschedule visits upon his release at the end of May 2024. The guardian was unwilling to increase visitation to unsupervised due to father's ongoing legal issues.

At the postpermanent plan review hearing on July 10, 2024, father was present while in custody at the Fresno County jail. The juvenile court found legal guardianship with dependency continued to be the appropriate plan, and another review hearing was set for December 18, 2024.

The department's report for the postpermanent plan review hearing recommended that legal guardianship remain as the children's permanent plan. The setting of a section 366.26 hearing to assess a plan of adoption was recommended for the children's sibling, C.C. At 12 years of age, C.C. made numerous requests to be adopted by the children's current guardians.

In an addendum report, the department requested that a section 366.26 hearing be set to assess for a plan of adoption on behalf of the children as well. On December 17, 2024, father was sentenced to more than three years in state prison for charges of possession of a controlled substance, possession of a firearm by a felon, and possession for sale of a controlled substance. The department's assessment determined that a plan of adoption would be more appropriate for the children, and the guardians were willing to provide a plan of adoption for each of the children. C.G.'s clinician informed the social worker that a plan of adoption with the guardians would be beneficial for C.G.

At a continued review hearing held on January 22, 2025, father refused transport from the Department of Corrections and Rehabilitation. Visitation between the children and parents was ordered to be supervised, and a section 366.26 hearing was set for May 21, 2025, for the children and C.C.

***August 2025 Selection and Implementation Hearing***

The section 366.26 report, dated May 13, 2025, recommended that the juvenile court terminate the parental rights of mother and father and a plan of adoption be ordered for the children and C.C. The children remained placed together in the home of C.C.'s grandparents, who had been appointed as their guardians. C.G. had been placed in the home since he was eight months old, and E.G. was placed with the guardians shortly after his birth. The guardians felt the children were already their own children because they had cared for them since the children were infants. At four years of age, C.G. was on track developmentally and physically healthy. Three-year-old E.G. had no medical or developmental concerns, and his behaviors appeared to be age-appropriate.

In February 2025, father informed the adoption social worker that he would be transferred to fire camp and his anticipated release date was December 2025. Father had been participating in virtual visits with the children during his incarceration in state prison. The children were not receptive to in-person visits because they would cry and

6.

yell when department staff tried to pick them up. The virtual visits took place each week for about 15 minutes.

The adoption social worker observed three of the virtual visits in March 2025 and April 2025. Father greeted the children and asked them questions. C.G. responded to father's questions, but E.G. would often remain quiet. The children jumped around the room and played with their toys while father told them he missed and loved them. It was noted that father was consistent in visiting the children throughout the case.

The adoption social worker's assessment concluded that the children had been out of the parents' care for the majority of their lives, and their guardians had a significant amount of time to build a parent-child relationship with the children. The guardians expressed their commitment to adoption during each home visit with the social worker. The children's sibling, C.C., desired to be adopted because he felt safe and well cared for in the guardians' home. The department believed the children deserved to have stability and continuity in their life through a plan of adoption.

On May 19, 2025, father filed a section 388 petition requesting "to put services on hold and an opportunity to reunif[y] with [the] children." The petition alleged father "completed most of [his] services and tested negative" after a prior incarceration. The children's best interest was alleged to be served because he thought his relationship with the children was "strong."

The juvenile court set the section 388 petition for a hearing on the same date as the upcoming section 366.26 hearing. Both hearings were continued to allow for further assessment by parents' counsel. On June 16, 2025, mother filed a section 388 petition requesting the children be placed in her care under a plan of family maintenance. A hearing was set on mother's request for July 16, 2025.

The department filed an addendum report, which recommended that father's request for additional reunification services be denied. The adoption social worker did not believe the children should have to linger in foster care any longer. The assessment

determined father had not demonstrated a change in behavior due to his recent arrest for criminal behavior, and additional reunification services did not serve the children's need for permanency.

The social worker's report also included an assessment of the children and C.C.'s relationship with J.L. due to the court's previous determination that C.C.'s relationship with mother and J.L. prevented him from being adopted. Although C.C. was conflicted about his desire for a permanent plan of adoption during the previous section 366.26 hearing, he had consistently expressed a desire to be adopted for the past year. On June 4, 2025, the adoption social worker asked both children if they wanted to grow up with the guardians. The children each responded, "[Y]es," and E.G. identified the guardian as his "mom."

In a separate addendum report, dated July 15, 2025, the department recommended that mother's section 388 petition be denied. It was determined that mother's circumstances had not changed significantly enough to provide her with family maintenance services.

On August 20, 2025, father appeared through a videoconferencing platform for the contested hearing on the parents' section 388 petitions and section 366.26 hearing. The contested hearing began with testimony from the adoption social worker, Monica R., and she testified over the course of several dates. Monica testified regarding her experience as a social work practitioner. She served as the adoption social worker during the previous section 366.26 hearing, and she was reassigned to the case in February 2025. The sibling relationship between C.C. and J.L. was described by Monica as "[a] mere friendship."

Mother testified regarding her relationship with the children. She described her visitation with the children throughout the proceedings. Mother also provided testimony in support of her request for family maintenance services. She was participating in an

outpatient substance abuse program and a 12-step program. Mother believed any permanent plan other than adoption would be in the children's best interest.

On December 3, 2025, the contested hearing continued with testimony from father. He was visiting in-person with the children twice per month for one hour since his release from prison on September 20, 2025. Father had been in prison since June 2024. Video visits were difficult for father to gain the children's full attention, but he still made an effort to have them while he was in custody. Father testified the children recognized him and called him "Dad" during the video visits. Father's in-person visits felt "a lot different" because the children appeared excited to see him. He testified that his bond and relationship with the children kept getting stronger.

Father described the children as "confused and scared" when visits first started. He believed the children were afraid of getting in trouble with the care provider for talking to him. The children warmed up to father once he was in the visitation room. During the visits, father and the children ate and played together. Father was still getting to know the children because they had been away from him, but he felt the children trusted him.

In his testimony, father claimed there were several occasions that he asked for more time with the children throughout the history of the case. During those conversations, the social worker asked questions about his history, but he did not believe his past was relevant to his requests for increased visitation. He filed his section 388 petition to seek more time to reunify with the children. Father's counsel then asked, "Why do you feel like that would be in the best interest of the children?" (Boldface omitted.) The juvenile court interrupted by stating,

> "I'm not finding that relevant. I don't have a statutory ability to do it. We were at 24 months – 28 months before we got to guardianship a couple years ago. So it's a request I would make if I were dad, too. And I don't know that I can. Do you have a legal justification?"

9.

Father's counsel clarified that she was aware of a statutory provision that allows six more months of family reunification services after a section 366.26 hearing, but she was not sure if it was applicable in a legal guardianship situation. The juvenile court confirmed that the children were in a permanent plan above long-term foster care. Father's counsel then stated, "I think what he would be asking for is that if mom [gets] family maintenance, for him to have enhancement services." The juvenile court responded, "That makes sense. Ask in that context. Forgive me."

Father indicated he was in support of mother's request for family maintenance services, and he was willing to do any services offered by the department. He believed his request would be in the children's best interest because it would allow them to grow up with their mother and father. C.G. lived with father prior to his removal. Father was currently employed and surrounding himself with family. He was not in agreement with the plan of adoption for the children because the guardians would not allow him to be a father to the children. His testimony concluded with an acknowledgment of previous "bad choices," but he felt that he came a long way as a father.

In closing argument, counsel for the department and children requested the parents' petitions be denied and termination of parental rights for the children and C.C. Counsel for mother argued that either her section 388 petition should be granted or the beneficial parent-child relationship exception to adoption was applicable. Father's primary request was to not terminate parental rights for the children. Father's counsel expressed support for mother's request for family maintenance services, and he requested enhancement services be provided in the event that mother's petition was granted. His counsel cited section 366.3, subdivision (f) as authority to support his request for additional services.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the section 388 petition. The juvenile court reviewed the children's case history, and it noted that four years and 10 months had passed since C.G.'s initial placement into

foster care. This period was described as a "critical bonding and developmental stage" that father was unable to be present for. Father's recent efforts to invest in his sobriety were acknowledged by the juvenile court. However, the juvenile court concluded father's circumstances were "changing" instead of changed. In relation to the children's best interest, the juvenile court determined that any changes were not for a long enough period given the children's young ages.

As to the beneficial parent-child relationship exception to adoption, the juvenile court discussed the children's recognition of father and father's appropriateness during visitation. His relationship with E.G. was described as "developing." The court concluded there was not an adequate bond to overcome the adoptability assessment. The court also determined the sibling-relationship exception had not been proven.

Father's and mother's section 388 petitions were denied. The juvenile court found the children and C.C. were likely to be adopted, and it terminated the parental rights of mother and father and selected a permanent plan of adoption for the children and C.C. Father filed a timely notice of appeal.

## DISCUSSION

### I. Exclusion of Testimony

Father contends the juvenile court erred by excluding father's testimony about the reasons that granting his section 388 petition was in the children's best interest.

#### A. Legal Principles

The juvenile court has broad discretion to control the proceedings before it. (§ 350, subd. (a)(1); *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758.) It is thus "reasonable for the court, in pursuit of its statutory duties, to ascertain the issues relevant to the hearing and make some relevancy determinations. That power should be exercised in such a manner as to make clear for all an identification of the issues and a recognition that time is not an unlimited commodity in today's busy juvenile courts." (*Ingrid E.*, at p. 760.)

11.

At a section 366.26 hearing, the court shall review the report prepared by the department and "receive other evidence that the parties may present." (§ 366.26, subd. (b).)

" 'While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings "are not entitled to full confrontation and cross-examination." [Citation.] Due process requires a balance. [Citation.] The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will "necessitate undue consumption of time." (Evid. Code, § 352.) The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.' " (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)

**B.     Standard of Review**

"Except to the extent the [juvenile] court bases its ruling on a conclusion of law (which we review de novo)" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773), the court "is vested with broad discretion in ruling on the admissibility of evidence," and its rulings " ' "will be upset only if there is a clear showing of an abuse of discretion" ' " (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121). " ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " ' " (*Ibid.*)

**C.     Analysis**

The juvenile court was called upon to decide whether father had proven by a preponderance of the evidence that his section 388 petition should be granted. Father's section 388 petition did not explicitly request additional family reunification services pursuant to section 366.3, subdivision (f). Under the section asking which order the petitioner wanted the judge to make now, father input, "I would like to put services on hold and an opportunity to reunif[y] with my children."

At trial, father answered in the affirmative when asked by his counsel if he filed a section 388 petition requesting more time to reunify. Father's counsel then asked, "Why do you feel like that would be in the best interest of the children?" (Boldface omitted.)

The juvenile court interjected as follows:

"I'm not finding that relevant. I don't have a statutory ability to do it. We were at 24 months – 28 months before we got to guardianship a couple years ago. So it's a request I would make if I were dad, too. And I don't know that I can. Do you have a legal justification?"

Father's counsel indicated there was a provision allowing for six months of additional family reunification services after a section 366.26 hearing. However, she did not have the citation, and she was uncertain if the provision applied to a legal guardianship. His counsel then clarified that his request would be to receive enhancement services if mother was provided family maintenance services. The juvenile court permitted father to testify as to why it would be in the children's best interest for him to "do any services the [d]epartment might offer [him]." (Boldface omitted.)

In its proper context, the juvenile court's comments do not amount to an exclusion of relevant evidence or an abuse of its discretion. The juvenile court merely questioned the basis for father's section 388 petition. After father's counsel provided clarification, the juvenile court permitted him to testify regarding his request for enhancement services. Even if the juvenile court was mistaken in its belief that family reunification services could not be ordered for father pursuant to section 366.3, subdivision (f), no such request was made by father on the record. Accordingly, father fails to demonstrate error on this point.

## II.    Denial of Section 388 Petition

Father contends the juvenile court erred when it failed to grant his section 388 petition. He argues that the court abused its discretion because the request was in the children's best interests.

13.

## A.   Legal Principles

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and changing the order will serve the child's best interests.  (§ 388, subd. (a); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)  The petitioner has the burden of proof by a preponderance of the evidence.  (Cal. Rules of Court, rule 5.570(h)(1)(D).)  In assessing the petition, the juvenile court may consider the entire history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Section 388 serves as an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights.  [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation] …." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate.  [Citation.]  In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated.  [Citation.]  The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order.  [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)  "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests.  [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

When determining whether a modification under section 388 would be in the best interests of the child, courts have considered several factors including but not limited to: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been.…" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

### B.    Standard of Review

We review the denial of a section 388 petition after an evidentiary hearing for abuse of discretion. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Id.* at pp. 318–319.) " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) Where there is conflicting evidence, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1529.)

### C.    Analysis

In the present case, the juvenile court determined that father did not prove the children's best interests were served by granting his request. Father provided evidence that he was employed, invested in his sobriety, and maintained his relationship with the children through regular visitation. These facts were understood and acknowledged by the court. However, it is irrelevant that there may be evidence which would support a conclusion contrary to that of the juvenile court. (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) The court denied father's section 388 petition because it did not find that continued uncertainty was in their best interests, given the children's need for permanency. Thus, the court properly focused on permanency and stability when it considered father's request to delay the children's proposed plan of adoption.

At this stage in the proceedings, father's best interest is "simply no longer the focus." (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 527; see *ibid.* ["after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability"].) Father's argument that his bond with the children and past participation in his case plan required another opportunity for him to reunify ignores the legally required shift in focus once his prior efforts failed. According to *In re Debra M.* (1987) 189 Cal.App.3d 1032 (superseded by statute on other grounds as stated in *In re Eli F.* (1989) 212 Cal.App.3d 228, 234), "[t]he reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it. [¶] The Legislature has expressed increasing concern with the perceived and accurate reality that time is of the essence in offering permanent planning for dependent children." (*Debra M.*, at p. 1038.)

Father's section 388 petition contemplated further delay in permanency for children that had remained in out-of-home care for over four years. His argument that the *Kimberly F.* factors warranted the relief he sought is little more than an invitation for this court to reweigh the evidence. It is the exclusive province of the juvenile court to evaluate credibility and determine what weight to give testimony. (See *In re Laura F.* (1983) 33 Cal.3d 826, 833.) Furthermore, the juvenile court properly focused on whether the relief father sought would advance the children's interest in permanence and stability and found otherwise. We conclude therefore the trial court did not abuse its discretion in denying father's request. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

## III. Beneficial Parent-child Relationship Exception

Father's next contention is that the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. Father asserts that the juvenile court "failed to consider the primary attachment of [the children] to Father."

16.

## A.    Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies.  (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact.  (*Ibid*.)

The second element of the exception asks whether the child would benefit from continuing the relationship.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The juvenile court's focus

17.

should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

In *Caden C.*, the court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

## B. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639–640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W. supra*, 180 Cal.App.4th at p. 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528.)

## C. Analysis

In the present case, the juvenile court determined that father did not meet his burden of proof as to the application of the beneficial parent-child relationship exception. The department concedes that substantial evidence exists in the record to support a finding that father visited regularly. However, the juvenile court did not find there was sufficient evidence that maintaining the children's relationship with father outweighed the benefits of adoption to establish the exception.

In support of his contention that the juvenile court erred in failing to apply the exception, father cites to evidence that he had positive and affectionate interactions with the children during visits. While father consistently visited the children, satisfying the first prong of the exception, he failed to identify any evidence that would compel a finding that termination of his parental rights would cause the children great harm. The evidence before the court established that the children appeared to enjoy the supervised visits that occurred with father for the four years following their removal. However, evidence that the children had pleasant visits with their father is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant."].)

We do not find that, in making its determination, the juvenile court abused its discretion by failing to consider father's attachment to the children. Viewed in its context, the juvenile court considered the children's need for stability based upon their young ages and longtime placement in out-of-home care. On balance, it concluded that ongoing interactions while father continued making positive changes to his life was not as beneficial as their greater need for stability.

In sum, the evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that the children were still young and spent the majority of their young lives in the care of their prospective adoptive parents, we find the juvenile court did not abuse its discretion. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating father's parental rights were proper.

## **DISPOSITION**

The juvenile court's orders are affirmed.

DETJEN, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.